**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE CONNECTORS REALTY GROUP CORPORATION and DARRYL WILLIAMS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 19-cv-00743 |
| STATE FARM FIRE & CASUALTY COMPANY, | ) ) ) | Judge Jeremy C. Daniel |
| Defendant. | ) ) ) | |
| _____ | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................II

TABLE OF AUTHORITIES ....................................................................................... IV

I.  INTRODUCTION ............................................................................................. 1

II.  FACTUAL BACKGROUND ............................................................................ 1

   A. Plaintiffs Experienced State Farm's Discriminatory Practices ........................................... 1

   B. State Farm Treats Class Members' Claims as Presumptively Fraudulent ......................... 2

   C. State Farm's Practice Is Intentionally Discriminatory ........................................................ 4

   D. ████████████████████████████████████████
    ████████████████████████████████........................................ 6

III.  APPLICABLE LEGAL STANDARDS ........................................................... 8

IV.  THE PROPOSED CLASS .................................................................................. 9

V.  THE PROPOSED CLASS IS ASCERTAINABLE ...................................... 10

VI.  THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(A)........ 11

   A. The Class Members Are So Numerous That Joinder Is Impracticable ............................ 11

   B. Numerous Common Issues Exist .................................................................................... 11

   C. Plaintiffs' Claims Are Typical of Those of Other Class Members.................................... 13

   D. Connectors and Its Counsel Will Adequately Represent The Class ................................. 13

VII.  THE COURT SHOULD CERTIFY THE PROPOSED CLASS
UNDER RULE 23(B)(3) ...............................................................................  15

   A. Common Issues Of Fact And Law Predominate................................................................. 15

     1. Common issues predominate for Connectors Disparate Impact Claim. ...................... 16

     2. Common issues predominate in Connectors' intentional discrimination claims under
     the FHA and Section 1981 and 1982. ................................................................................. 17

     3. State Farm's defenses or attacks against Connectors' claims of discrimination are
     common to the Class. ........................................................................................................... 18

   B. A Class Action Is The Superior Method Of Adjudicating The Dispute ............................ 19

VIII.   CONCLUSION ................................................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997) ............................................................................................ 14, 15

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) .................................................................................................. 9

*Bell v. PNC Bank, Nat. Ass'n*,
800 F.3d 360 (7th Cir. 2015) ...................................................................... 11, 12, 19

*Butler v. Sears, Roebuck and Co.*,
727 F.3d 796 (2013) ................................................................................................ 16

*Chapman v. Wagener Equities Inc.*,
747 F.3d 489, 492 (7th Cir. 2014) .......................................................................... 11

*Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*,
797 F.3d 426 (7th Cir. 2015) .............................................................................. 9, 12

*Cnty. of Cook v. Bank of Am. Corp.*,
584 F. Supp. 3d 562 (N.D. Ill. 2022) ...................................................................... 17

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .................................................................................................. 16

*Culver v. City of Milwaukee*,
277 F.3d 908 (7th Cir.2002) ................................................................................... 14

*Dechert v. Cadle Co.*,
333 F.3d 801 (7th Cir. 2003) .................................................................................. 14

*East Texas Motor Freight Sys., Inc. v. Rodriguez*,
431 U.S. 395 (1977) ........................................................................................... 12, 20

*Est. of Gardner v. Cont'l Cas. Co.*,
316 F.R.D. 57 (D. Conn. 2016) ............................................................................... 20

iv

*Friedel v. City of Madison*,
832 F.2d 965 (7th Cir. 1987) ............................................................................ 18

*General Telephone Co. of Southwest v. Falcon*,
457 U.S. 147 (1982) .......................................................................................... 14

*Haynes v. Logan Furniture Mart Inc.*,
503 F. 2d 1161 (7th Cir. 1974) ........................................................................ 20

*In re Allstate Corp. Sec. Litig.*,
966 F.3d 595 (7th Cir. 2020) .............................................................................. 9

*Keele v. Wexler*,
149 F.3d 589, 595 (7th Cir. 1998) .................................................................... 13

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) .......................................................................................... 18

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
672 F.3d 482 (7th Cir. 2012) ............................................................................ 12

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) ............................................................... 9, 12, 16

*Mullins v. Direct Digital, LLC*,
795 F.3d 654 (7th Cir. 2015) ............................................................................ 10

*Mulvania v. Sheriff of Rock Island Cnty.*,
850 F.3d 849 (7th Cir. 2017) ............................................................................ 11

*Oshana v. Coca–Cola Co.*,
472 F.3d 506 (7th Cir.2006) ......................................................................... 9, 10

*Parko v. Shell Oil Co.*,
739 F.3d 1083 (7th Cir. 2014) .......................................................................... 11

*Phillips v. Asset Acceptance, LLC*,
736 F.3d 1076 (7th Cir. 2013) .......................................................................... 14

*Ramirez v. Greenpoint Mortg. Funding, Inc.*,
268 F.R.D. 627 (N.D. Cal. 2010) ................................................................ 17

*Red Barn Motors, Inc. v. NextGear Capital, Inc.*,
915 F.3d 1098, 1100 (7th Cir. 2019) ........................................................... 9

*Scott v. Family Dollar Stores, Inc.*,
733 F.3d 105 (4th Cir.2013) ...................................................................... 12

*Smith v. Family Video Movie Club, Inc.*,
311 F.R.D. 469 (N.D. Ill. 2015).................................................................. 10

*Suchanek v. Sturm Foods, Inc.*,
764 F.3d 750, 759 (7th Cir. 2014) ............................................................. 19

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Commtys. Project, Inc.*,
576 U.S. 519 (2015)................................................................................... 16

*Texas Department of Community Affairs v. Burdine*,
450 U.S. 248 (1981)................................................................................... 18

*Tyson Foods, Inc. v. Bouphakeo*,
577 U.S. 442 (2016)................................................................................... 15

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)............................................................................ 11, 13

**Statutes**

42 U.S.C. § 1981 ................................................................................. 17, 18

42 U.S.C. § 1982 ................................................................................. 17, 18

42 U.S.C. § 3601 ................................................................................. 16, 18

**Other Authorities**

Fed. R. Civ. P. 23 ............................................................................... passim

*McLaughlin on Class Actions* § 4:2 .............................................................. 10

## I.     INTRODUCTION

This case is ideally suited for class certification. State Farm's uniform discriminatory treatment of Class Members[1] across Illinois makes class certification appropriate. Further, the legal and factual issues that will need to be decided can and are more appropriately decided on a class-wide basis. Accordingly, Plaintiffs request the Court certify the proposed class, appoint the undersigned as class counsel, and direct that notice be sent to all class members.

## II.     FACTUAL BACKGROUND

### A.  **Plaintiffs Experienced State Farm's Discriminatory Practices**

Plaintiff Darryl Williams ("Williams") is the President and sole owner of Plaintiff The Connectors Realty Group Corporation ("Connectors" or "Plaintiffs"). Aff. of D. Williams (Exhibit 1), ¶ 1; Dep. of D. Williams (Exhibit 2), p. 62:17-63:8. Connectors was the owner of an eight unit building on the south side of Chicago located at 622-624 West 79th Street (the "Property").[2] Aff. of D. Williams, ¶ 5. State Farm Fire & Casualty Company ("State Farm") thereafter issued a property insurance policy (the "Policy") for the Property.[3] *Id.*, ¶ 6. During the Policy period, Connectors suffered a covered loss caused by the pipes bursting in a unit in its Property and then suffered subsequent covered losses due to State Farms' delayed review process. *Id.*, ¶¶ 7-8.f.

During the claims process, Connectors' claims were referred to the Special Investigations Unit ("SIU") and investigated for fraud. Beavers Dep. (Exhibit 3), pp. 118:10-20; Krupp Dep. (Exhibit 4), pp. 36:3-6. Plaintiffs were met with discrimination by a State Farm claims representative emanating from State Farm's policy and practices of treating Class Members'

---

[1] As used herein, the "Class" or "Class Members" refers to the class definition in Section IV., *infra*.

[2] Connectors was the owner of the subject property and policyholder with State Farm, and so Williams is not seeking to be named as a class representative in this matter, but at all relevant times he was and is the sole owner of Connectors.

[3] As used herein, "State Farm" or "Defendant" means State Farm Fire & Casualty Company.

claims as presumptively fraudulent. Aff. of D. Williams, ¶ 10; *see also, infra*. II.C. The claims were consolidated and handled under a master claim. Krupp Dep., p. 144:2-15. Ultimately, most of Connectors' claims were denied, and none were paid in full. Beavers Dep., 114:2-19; 158:9-16, Ex. 1 to Beavers Dep. (SFCONNECT000028PROD-40PROD included with deposition).

### B. State Farm Treats Class Members' Claims as Presumptively Fraudulent

Plaintiffs and Class Members must submit insurance claims to State Farm. Part of State Farm's review of policyholders' claims includes investigating potential fraud. State Farm has a Special Investigative Unit or Special Investigations Unit[4] that investigates potential instances of fraudulent insurance claims. State Farm uses National Insurance Crime Bureau ("NICB") indicators of fraud as part of that investigation. Krupp. Dep., pp. 37:5-8, 73:2-7, 136:6-14; Beavers Dep., pp. 91:10-93:11; NICB Indicator Instructions (Exhibit 5). State Farm employees select or add the indicators to a policyholder's claim file in an internal State Farm computer system. NICB Indicator Instructions; Beavers Dep., pp. 91:14-21. Some of these indicators are particularly susceptible to discrimination, and all are generic phrases or words applied to a particular claim. For example, "The burned building is in a deteriorating condition and/or located in a deteriorated neighborhood," was one of the NICB indicators of fraud applied to Connectors' claims. *See* Beavers Dep., 150:23-151:20.

Since at least 2015, State Farm has encouraged its claims handlers to process claims filed by policyholders in African American majority ZIP codes throughout Illinois as presumptively fraudulent in several ways, including by denying claims and referring them to the SIU, which results in a disproportionate amount of denied claims and delayed payments. State Farm has done this through explicit programs run by the managers of the SIU to encourage more claims being

---

[4] As used herein, "SIU" shall refer to the State Farm Special Investigative Unit.

assigned for review by SIU representatives. Krupp Dep., pp. 106:24-107:5. For example, since at least 2015, State Farm's managers furthered this practice through an initiative they called "Fill the Cups." State Farm Emails (Exhibit 7) (SFCONNECT00261PROD, 2653,2653,2655, 2681, 2690,2696, 2705); Krupp Dep., pp. 13:2-5 ("[Fill the Cups] was a term used to make sure that we were increasing the inventory and capacity of our [SIU] claim reps."); Diaz Deposition (Exhibit 6), pp. 27:13-22; 39:15-40:1. Roger Krupp, who spent 33 years at State Farm, leaving in 2019. Krupp recalls Fill the Cups beginning four or five years from when he was last there. Krupp Dep., p. 106:13-16; Decl. of Dr. Campbell Jackson (Exhibit 8), ¶¶ 7-10. Fill the Cups was used to maximize State Farm's "resources to capacity to ensure that we were able to handle as many claims as possible that had NICB indicators of fraud." C. Dodson Dep. (Exhibit 9), pp. 52:21-53:4. State Farm's employees throughout State Farm were encouraged the refer claims to SIU. *Id.*, p. 59:3-7. Claims increased as a result. Diaz Dep., pp. 39:15-40:1; Krupp Dep., pp. 26:6-15, 105:11-14.

This initiative spanned multiple layers of the hierarchy of State Farm and was accessible throughout State Farm via State Farm's TAC software, used to analyze claims, and on Microsoft Outlook and Word, and the number of claims was tracked across the hierarchy of State Farm. State Farm Emails; Decl. of Dr. Campbell-Jackson, ¶¶ 13, 16, 18; Golden Dep. (Exhibit 10), pp. 31:14-21, 56:9-61:21. The number of claims assigned to each representative was monitored, and the managers were judged by the number of claims that they were sending to the SIU. Decl. of Dr. Campbell-Jackson, ¶¶ 18-19. ███████████████████████████

███████████████████████████████████████████ Golden Dep., pp. 31:14-21, 56:9-61:21, 172:17-175:4, Ex. 1 to Golden Dep. (SFCONNECT002711PROD included with deposition).

### C. **State Farm's Practice Is Intentionally Discriminatory**

For Plaintiffs, the first indication of State Farm's intentional discrimination began when Williams was speaking with State Farm claims representative Tina Beavers ("Beavers"). Towards the beginning of his claims process, Williams spoke with Beavers in a telephone conversation wherein Beavers was saying she was unable to get in contact with one of the tenants at the Property, Lynette Crawley, which led to Beavers stating, "You mean to tell me you people don't use Facebook and other social media and you don't know any of her homeys who could get in contact with her?" Aff. of D. Williams, ¶ 10. Beavers further said, "We have a lot of fraud in your area." Aff. of D. Williams, ¶ 10. By "your area" she said she meant "South side of Chicago and you all's neighborhoods." Aff. of D. Williams, ¶ 10.

This interaction is relevant to class certification for two reasons. First, Beaver's conversation is an explicit manifestation of State Farm's policy and practice of treating Class Members' property claims as presumptively fraudulent. Former State Farm Section Manager in the SIU for multiple states, including Illinois, Dr. Carla Campbell-Jackson witnessed this practice amongst her colleagues and superiors in handling claims and against Class Members. Decl. of Dr. Campbell-Jackson, ¶¶ 3, 7, 9, 15, 19, 20. Claims Manager Celeste C. Dodson, a supervisor of the SIU Section Managers, would hold and facilitate a recurring SIU Section Manager "huddle," *i.e.*, a meeting via videoconference, with Dr. Campbell-Jackson and the other SIU Section Managers where they would review the statistics regarding referral of claims to the SIU and how to increase the number of claims sent to SIU in an effort to "Fill the Cup(s)." *Id.*, ¶ 7. "During the huddles Ms. Dodson would show statistical comparisons of how many claims were coming into each Section in the Dodson SIU Division." *Id.* She would also encourage the SIU Section Managers to take action to increase the number of claims into SIU. *Id.* Often Ms. Dodson encouraged the SIU

Section Managers to have their employees attend Property Damage and Bodily Injury Team meetings to encourage submissions of claims to SIU. *Id.* During the huddles and in personal one-on-one meetings with her, "Ms. Dodson discussed the various neighborhoods where she said there was a high propensity for the submission of fraudulent claims, including the inner cities of Chicago… including, but not limited to, the South Side of Chicago, the West Side of Chicago, and East St. Louis." *Id.* She referred to these neighborhoods as "inner city" and/or "high risk for fraud" neighborhoods. *Id.*, ¶¶ 6, 7. Ms. Dodson further stated that "there is fraud in those areas" and that claims from inner city neighborhoods had "high fraudulent activity." *Id.* These statements by Ms. Dodson about the "fraud in those areas" and "high risk of fraud neighborhoods" mirrors the comments of Beavers that "We have a lot of fraud in your area," by which she said she meant "South side of Chicago and you all's neighborhoods." Aff. of D. Williams, ¶ 10.

Second, Beavers' statements are relevant for another aspect of State Farm's intent, which is, when presented with information about its discrimination, State Farm does nothing to change or adjust its practices or correct any of its employees. Dr. Campbell-Jackson reported to Claims Manager Celeste Dodson and other individuals regarding her discovery that State Farm's practice of treating Class Members' claims as presumptively fraudulent, including through the Fill the Cups initiative, was disproportionately affecting minority policyholders. Decl. of Dr. Campbell Jackson, ¶¶ 8, 19-20. Similarly, when Williams reported Beavers' comments to State Farm, State Farm did nothing to investigate the complaint and, instead, reassigned Connectors' claims to an SIU representative. Beavers Dep., pp. 140:5-141:4, 147:2-147:16; Krupp. Dep., pp. 39:12-40:6; 126:16-127:13.

State Farm's intent is further demonstrated by the fact there is no legitimate need or reason for State Farm to push for increasing the number of claims referred to the SIU. Decl. of Dr.

Campbell Jackson, ¶ 21. State Farm maintains that it examines every claim on its merits. *Id.*, ¶ 20; Dodson Dep., pp. 15:11-17; Lehman Dep. (Exhibit 11), p. 88. Yet, State Farm runs data analysis programs that will pull claims for additional review for referral to the SIU even when individual investigators did not otherwise flag them for review. Lehman Dep., pp. 75, 80-81. If State Farm examined each claim on its merits, there would simply be claims that are fraudulent and those that are not. Encouraging more claims to be sent to the SIU is not a means of judging a claim on its merits. If each claim were being judged on its merits, why would Ms. Dodson tell SIU Section Managers that "We must 'Fill the cups.'" Not only were State Farm claim representatives exhorted to "Fill the Cups" at weekly huddles of SUI Section Managers, but also at national Enterprise-led meetings at hotels around the country attended by the upper-echelons of State Farm management, where State Farm claim representatives were treated to lush accommodations, meals and entertainment. Decl. of Dr. Campbell Jackson, ¶¶ 10-12. At one such meeting attendees were told, "We hit a home run in Filling the Cups." Decl. of Dr. Campbell Jackson, ¶ 12. State Farm representatives there were also told, that there were 30,049 claims sent to SIU as a result of Filling the Cups in 2015. *Id.* State Farm representatives there were also told that so-called "savings" to State Farm for claims not paid, *i.e.*, denied, in the SIU for the year 2015 was $135,551,132.72. *Id.*

**D.** ███████████████████████████████
█████████████████████████████████████

The class consists of African American policyholders of property insurance policies with State Farm. Plaintiffs have received claims data from State Farm for the entirety of claims submitted by policyholders in every ZIP code of Illinois from 2015 through 2022. ████████
███████████████████████████████████████

████ Mensah Report (Exhibit 12), ████████.

Plaintiffs' statistical and damage expert, Dr. Edward Mensah is an Emeritus Associate

Professor of Health Economics and Informatics at University of Illinois-Chicago. Mensah Report, p. 1. Dr. Mensah reviewed the entirety of property claims submitted to State Farm in Illinois from 2015 to 2022. *See*, Mensah Report, pp. 2-5. Dr. Mensah analyzed these claims using standard statistical methods of the chi-square test and log-binomial regression and ████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

In analyzing the outcomes of these claims, ██████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████ *Id.*, pp. 2, 5-11. ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████ *Id.*, p. 2, 4-5. In flat figures, ████████████████████████████████

████████████████████████████████ *Id.*, p. 5 Table 1. ████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████ *Id.*, p. 5. ████████████████████

████████████████████████████████████████████████████████████████████████ *Id.*, pp. 5-9, Figures 1 and 2; Mensah Rebuttal Report (Exhibit 13), pp. 6-12.

Dr. Mensah clearly states, ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

Mensah Rebuttal, p. 15. ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████ Mensah Dep. (Exhibit 14), pp. 30:19-31:2;

Mensah Rebuttal Report, pp. 13-15.

Dr. Mensah has established a calculation of damages that can be applied to Class Members for the damage they suffered as a result of State Farm's discrimination based on the class wide data provided by State Farm. Mensah Report, pp. 36, 39-40. ██████████████████

██████████████████████████████████████████████████

███████████████████████████████ *Id.*, pp. 41-42; Mensah Dep., 118:10-119:24. Further, these calculations can be made based on the class-wide data without an examination of individual circumstances on claim. Mensah Report., Tables 16-31, Appendix 1.

Dr. Mensah's background and experience are significant, and he used reliable statistical and economic methods. Mensah Curriculum Vitae (Exhibit 15); Mensah Dep., pp. 20:19-21:1, 155:15-160:19. Plaintiffs' expert Robert Muriel is an attorney and former Director of the Illinois Department of Insurance, and for the reasons identified in his report, he found Dr. Mensah's report and analysis to be ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████ Muriel Report (Exhibit 16), p. 11.

## III.    APPLICABLE LEGAL STANDARDS

To certify a class under Rule 23, Plaintiffs must show that the Proposed Class meets the requirements of Rule 23(a) and at least one of the three criteria under Rule 23(b). *See* Fed. R. Civ. P. 23. Rule 23(a) imposes four prerequisites: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or

defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy of representation). C*hicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 433 (7th Cir. 2015). Also, "one of the four categories set forth in Federal Rule of Civil Procedure 23(b) must be met" as well. *Red Barn Motors, Inc. v. NextGear Capital, Inc.*, 915 F.3d 1098, 1100 (7th Cir. 2019).

Finally, there is an implicit requirement that a class must be sufficiently definite that its members are ascertainable. *Oshana v. Coca–Cola Co.*, 472 F.3d 506, 513 (7th Cir.2006). Class certification is subject to the district court's discretion. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Although questions of fact overlapping the merits of the case "may be relevant at both the class certification and merits stages" to determine whether to certify a class, the Court may consider merits questions "'to the extent—and only to the extent—that they are relevant' in applying the Rule 23 requirements." *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 603 (7th Cir. 2020) (quoting *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013)). Simply stated, the certification stage is not a "dress rehearsal for the trial on merits." *Messner*, 669 F.3d at 811.

## IV.   THE PROPOSED CLASS

Plaintiffs seek certification of the following class for violations of the Fair Housing Act and 42 U.S.C. §§ 1981 and 1982, under Rule 23(b)(3):

> All African-Americans in the State of Illinois who reside in majority African-American ZIP Code areas and have submitted claims for property loss and damage to State Farm during the period 2015 until the time judgment is entered herein and whose claims have either been denied, sent to the State Farm Special Investigations Unit for Fraud or otherwise treated as presumptively fraudulent.

Excluded from the proposed Class are: (1) State Farm, any entity or division in which State Farm has a controlling interest, and its legal representatives, officers, directors, assigns, and successors;

(2) the Judge to whom this case is assigned and the Judge's immediate family and staff; and (3) governmental entities.

## V.     THE PROPOSED CLASS IS ASCERTAINABLE

A class must be sufficiently definite that its members are ascertainable. *Oshana*, 472 F.3d at 513. Ascertainability requires that a class be "defined clearly and based on objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). This requirement focuses on the adequacy of the definition. If the definition is adequate, the court does not concern itself with whether "it would be difficult to identify particular members of the class. *Id.*  Though some circuits recognize a heightened standard of ascertainability for cases brought under Rule 23(b)(3) in particular, the Seventh Circuit does not recognize such a heightened standard. *Id*. Namely, this threshold issue does not consider whether there is a reliable and administratively feasible way to identify the members of the putative class. *Id*., at 672 (rejecting adoption of the "heightened ascertainability requirement proffered in the Third Circuit.)

A class must be defined precisely—generally, this means that Plaintiff needs to identify a particular group harmed during a particular time frame, in a particular location, and in a particular way. *Id*. at 660 (citing *McLaughlin on Class Actions* § 4:2). Further, a class must be identified by objective criteria, and not by subjective criteria such as state of mind. *Id*. "The ascertainability requirement is not about evidence; it is about whether the proposed class definitions are based on objective criteria." *Smith v. Family Video Movie Club, Inc*., 311 F.R.D. 469, 475 (N.D. Ill. 2015) (citing *Mullins*, 795 F.3d at 659).

The proposed class here is unquestionably ascertainable. The members are initially identified by an objective, observable, and verifiable demographic trait—their race and location in African-American majority ZIP codes. The group was harmed during a particular time (between

10

2015 and the present), in a particular location (the State of Illinois), and in a particular way (underpayment on claims, undue scrutiny, and a presumption of fraudulence on claims made caused by a discriminatory policy).

## VI.    THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(A)

### A.   <u>The Class Members Are So Numerous That Joinder Is Impracticable</u>

The numerosity requirement is satisfied where, as here, "the class is so numerous that joinder of all members is impracticable," Fed. R. Civ. P. 23(a)(1). A class may be certified "without determination of its size, so long as it's reasonable to believe it is large enough to make joinder impracticable and thus justify a class action suit." *Chapman v. Wagener Equities Inc.*, 747 F.3d 489, 492 (7th Cir. 2014) (internal citation omitted). "While there is no magic number that applies to every case, a forty–member class is often regarded as sufficient to meet the numerosity requirement." *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017). Further, "[h]ow many (if any) of the class members have a valid claim is the issue to be determined *after* the class is certified." *Chapman*, 747 F.3d at 492 (quoting *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) (emphasis in original)).

Even if not precisely known, the Class is in ███████████████████████ and clearly meets the threshold required to consider joinder impracticable. *See* Mensah Report, p. 5 Table 1.

### B.   <u>Numerous Common Issues Exist</u>

The commonality requirement demands that "there [be] questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy this requirement, the claims must depend on "a common contention that is capable of class-wide resolution." *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 374 (7th Cir. 2015) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).

Where a harm is alleged to be caused by a company-wide, top-down policy, rather than by

"discretionary decisions of individual managers", the commonality requirement is met. *Id*. at 375. The fact that a top-down policy that is administered by individual managers does not defeat a finding of commonality. *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 437-38 (7th Cir. 2015) ("[S]ubjective, discretionary decisions can be the source of a common claim if they are, for example, the outcome of employment practices or policies controlled by higher-level directors, if all decision-makers exercise discretion in a common way because of a company policy or practice, or if all decision-makers act together as one unit."). If there is subjective discretion of individual managers in enforcing the policy, the court should "examine whether all managers exercise discretion in a common way with some common direction…[such that] the subjective practice at issue affected the class in a uniform manner. *Id*. (quoting *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 113 (4th Cir.2013)). An organization-wide policy that is facially race-neutral but has a disparate racial impact when applied presents common issues suitable to a class action composed of members of the disfavored race. *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 489-90 (7th Cir. 2012) (abrogated on other grounds); *Chicago Teachers Union*, 797 F.3d at 440.

This element does not require Plaintiffs to prove at the class certification stage the existence of such a policy, but only that it is "capable of proof at trial through evidence that is common to the class rather than individual to its members. *Id*., (quoting *Messner*, 669 F.3d at 818). Further, "suits alleging racial or ethnic discrimination are often by their very nature class suits, involving classwide wrongs…" and "[c]ommon questions of law or fact are typically present." *East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977).

Here, there are several key, common issues, including: 1) whether State Farm had a companywide policy or practice of treating Class Members' claims as presumptively fraudulent

by encouraging claims be sent to the SIU, denied or otherwise; 2) whether State Farm intended that policy to discriminate against the Class; 3) whether claims from African-American majority ZIP codes were disproportionately referred to the SIU and/or denied; and 4) whether State Farm's policy or practice of encouraging the referral of claims to the SIU disproportionately affected policyholders from African-American majority ZIP codes in Illinois.

### C.  Plaintiffs' Claims Are Typical of Those of Other Class Members

Commonality and typicality are closely linked. *Wal–Mart*, 564 U.S. at 349, n. 5. The typicality requirement demands that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998).

Connectors' claims here are typical of the class. Connectors' claims were for a covered loss at an insured property located in an African-American majority ZIP code in Illinois. Aff. of D. Williams, ¶ 5; Mensah Report, Appendix A. State Farm referred Connectors' claims to the SIU and were ultimately denied. *Supra*, II. A. State Farm's practice of treating claims from African American majority ZIP codes as presumptively fraudulent, through practices such as the Fill the Cups initiative and referring more claims to the SIU or denying more claims was in place during the class period, and Connectors' claims were submitted at that time. *Supra*, II. A. and II. B.

### D.  Connectors and Its Counsel Will Adequately Represent The Class

Rule 23(a)(4) requires representative parties to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement serves to prevent "conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*,

521 U.S. 591, 594 (1997) (citing *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157–158, n. 13, (1982). ("[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members.")). The class representative provides "minimal services", and the representative's role as a named party is "nominal." *Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1080-81 (7th Cir. 2013). In assessing adequacy of representation, the court looks to whether the class representative is situated such that he or she has sufficient incentive to assist in the claims of the class as a whole. *Id*. This does not require that the interests of the representative be aligned exactly with the unnamed plaintiffs—rather, the court will look to whether there is an actual and present conflict of interest. *See Dechert v. Cadle Co.*, 333 F.3d 801, 803 (7th Cir. 2003) (finding inadequacy of representation where the named plaintiff had a fiduciary duty in direct conflict with his duties as class representative).

Regardless, Connectors[5] easily meets this standard. Connectors has actively and vigorously prosecuted this action on behalf of the Class, including reviewing pleadings, answering interrogatories, attending an exhaustive and prolonged deposition. Further, Connectors' claims are typical of the Class and its interests are aligned with the Class.

This rule also applies to class counsel. *Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir.2002). The court considers the following factors: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law;" (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). In addition, courts may also "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P.

---

[5] It is worth reiterating at this point that Connectors is the proposed Class Representative, as Connectors, and not Mr. Williams, was the insured party.

23(g)(1)(B). Here counsel has worked tirelessly over several years to prosecute this case. This matter has been heavily litigated with motions of all kinds, and counsel has conducted extensive discovery, including conducting 14 different depositions (some through Rule 30(b)(6)), and retaining multiple experts. Both firms present decades worth of legal experience with the Anspach Law Office working primarily in insurance coverage litigation on behalf of policyholders while Gardiner Koch Weisberg & Wrona presents experience in most types of litigation at all levels of state and federal courts. Additionally, as demonstrated through the retention of experts and exhaustive work counsel has performed, counsel is willing to retain guidance and assistance of third-party claims processing or class notice companies to assist as needed.

## VII. THE COURT SHOULD CERTIFY THE PROPOSED CLASS UNDER RULE 23(B)(3)

### A. **Common Issues Of Fact And Law Predominate.**

A class may be certified under Rule 23(b)(3) where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance is satisfied when "the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation defeating, individual issues." *Tyson Foods, Inc. v. Bouphakeo*, 577 U.S. 442, 453 (2016) (internal quotation omitted). This inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* (quoting *Amchem*, 521 U.S. at 623). A question affects only individual members if it requires the presentation of evidence that varies from member to member, whereas a common question is one where "the same evidence will suffice for each member to make a prima facie showing[,] [or] the issue is susceptible to generalized, class–wide proof." *Id.*

To meet this requirement, plaintiff need not show identical damages class-wide, but only that the questions to be answered by the litigation are subject to proof through common evidence

15

and methodology. *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 800 (2013) (citing *Messner*, 669 F.3d at 819). Further, the requirement of predominance does not require that there be common questions as to damages if there are common questions as to liability. *Comcast Corp. v. Behrend*, 569 U.S. 27, 41-2 (2013). ("In particular, when adjudication of questions of liability common to the class will achieve economies of time and expense, the predominance standard is generally satisfied even if damages are not provable in the aggregate.") (internal citations omitted). In short, "the fact that damages are not identical across all class members should not preclude class certification." *Butler*, 727 F.3d at 801.

This requirement is met in this case. Common issues predominate here in both Connectors' claims of disparate impact under the Fair Housing Act (the "FHA"), 42 U.S.C. § 3601 *et seq.*, or intentional discrimination under the FHA and 42 U.S.C. §§ 1981 ("Section 1981") and 1982 ("Section 1982"). The trial will focus almost exclusively on State Farm's actions. Plaintiffs intend to prove State Farm's policy of treating Class Members' claims as presumptively fraudulent through various means led to a disproportionate number of referrals to the SIU and denials of claims for African Americans residing in majority African American ZIP codes. The theory of liability is identical across the board, as it is alleged to stem from an identifiable, central, and uniformly applied policy of treating claims from majority-black neighborhoods as presumptively fraudulent, denying claims, referring claims to the SIU or otherwise.

### 1. Common issues predominate for Connectors Disparate Impact Claim.

To succeed on a disparate impact theory under the FHA, Connectors must provide evidence that State Farm's practice of encouraging more claims being referred to the SIU had a "disproportionately adverse effect on minorities and are otherwise unjustified by a legitimate rationale." *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Commtys. Project, Inc.*, 576 U.S. 519,

524 (2015) (internal quotation omitted).

Common issues clearly predominate in Connectors' disparate impact claim because the inquiry in that claim is based on State Farm's own actions, practices and policies. Establishing a policy or practice by State Farm involves evidence related to the entire class, and the statistically disproportionate adverse effect is a result of an analysis of the entire class. The overriding common question regarding liability is whether State Farm engaged in a common policy or practice that adversely impacts the Class. The evidence establishing State Farm's policy will primarily, if not entirely, come from State Farm's own documents, information and testimony. *Supra*, II. C. Connectors will prove the disparate impact caused by State Farm's policy through its statistical analysis that will establish State Farm's liability to all class members based on data for the entire relevant population of claims. *Supra*, II. D., II. E. Resolving this dominant issue in the case will benefit Connectors and the Class the same and will be done with evidence common to the Class.

Importantly, the fact that Connectors' statistical analysis finding is based on the entire population of claims, which makes it unnecessary to consider other factors or individual factors in determining State Farm's liability to establish the disparate impact or statistical disparity. *Ramirez v. Greenpoint Mortg. Funding, Inc.*, 268 F.R.D. 627, 641 (N.D. Cal. 2010) (certifying a class based on discriminatory loan pricing for violations of the FHA). Further, damages can be calculated with class wide data as well. Mensah Report., pp. 36, 29-40, Tables 16-31, Appendix 1.

## 2. Common issues predominate in Connectors' intentional discrimination claims under the FHA and Section 1981 and 1982.

To succeed on a disparate treatment theory under the FHA, Connectors must provide evidence of State Farm's "intentional discrimination, provable via either direct or circumstantial evidence." *Cnty. of Cook v. Bank of Am. Corp.*, 584 F. Supp. 3d 562, 570 (N.D. Ill. 2022), *aff'd sub nom. Cnty. of Cook, Illinois v. Bank of Am. Corp.*, 78 F.4th 970 (7th Cir. 2023) (internal

citations omitted). Similarly, to succeed on its Section 1981 and 1982 claims of discrimination, it must show it is "the victim of intentional discrimination," which "may be done in a typical discrimination action either by direct proof or via the method of indirect proof outlined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–56 [ ] (1981) and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 [ ] (1973)." *Friedel v. City of Madison*, 832 F.2d 965, 972 (7th Cir. 1987) (internal citation omitted). The *McDonnell Douglas* burden-shifting framework is designed to "sharpen the inquiry into the elusive factual question of intentional discrimination." *Burdine*, 450 U.S. at 255 n.8. The key inquiry for purposes of class certification under these claims is State Farm's intent.

Similar to the disparate impact claim, the primary factual inquiry for Connectors' FHA disparate treatment claim and Sections 1981 and 1982 claims, concerns State Farm's actions. With these claims the common facts regarding State Farm's intent predominate, which would be shown through State Farm's documents, information and testimony. This inquiry concerns facts applying to the Class as a whole rather than any of State Farm's actions relating to individualized class members or individual insurance claims. What Connectors will show is that State Farm intentionally set forth a policy and practice within its claims department and SIU that it knew discriminated against Class members and did so intentionally to fill its pockets to the detriment of the Class whose claims were denied, underpaid, delayed payment, referred to the SIU or otherwise treated as presumptively fraudulent.

### 3. State Farm's defenses or attacks against Connectors' claims of discrimination are common to the Class.

State Farm's defenses against liability for Connectors' discrimination claims are common to the class as well. State Farm's expected arguments regarding the results of the statistical analysis, any potential legitimate business justification for its practice of encouraging more claims

be submitted to the SIU are issues common to the Class. Any argument regarding a less discriminatory alternative for its practices such as those encouraging the increase of claims referred to the SIU, via the Fill the Cups initiative or other manner, would be common to the class. State Farm's arguments regarding its intent in encouraging and investigating more claims from black majority ZIP codes is common to the Class as well.

Although common issues clearly predominate, State Farm's anticipated attack of raising individualized issues relating to specific claims "does not preclude certification of [the] class." *Bell*, 800 F. 3d at 379. Even the "inevitability" that a class may include certain people not specifically harmed by the complained-of actions does not prevent certification of the class. *Bell*, at 380. (upholding certification of class that was likely to include class members who were not harmed by the defendant's overtime policy because they never worked beyond their forty hours.)

**B. A Class Action Is The Superior Method Of Adjudicating The Dispute**

The superiority requirement demands that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). In particular, a court should consider:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of the class action.

*Id*. A class action is superior where the recovery of individual members of the class is likely to be small. *See Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 759 (7th Cir. 2014) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.") (internal quotation mark omitted).

19

As mentioned above, "suits alleging racial or ethnic discrimination are often by their very nature class suits, involving classwide wrongs…" and "[c]ommon questions of law or fact are typically present." *East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977).

Here, the superiority considerations favor certification. Even though some recoveries may not be so small as to make individual suits patently unlikely or unfeasible, Class Members would not have the same interest in pursuing individual actions based on discrimination. However, the damages the class seeks "are not significant relative to the costs of litigation against a massive insurer," such as State Farm, and "class-wide adjudication of Plaintiffs' claims would serve to efficiently resolve the claims or liabilities of many individuals in a single action, as well as eliminate the possibility of repetitious litigation and possibly inconsistent adjudications." *Est. of Gardner v. Cont'l Cas. Co.*, 316 F.R.D. 57, 76-77 (D. Conn. 2016) (certifying a class of long-term care insurance policyholders). A class action is superior and the most effective remedy available. *See Haynes v. Logan Furniture Mart Inc.*, 503 F. 2d 1161, 1164-1165 (7th Cir. 1974) (courts should consider the "inability of the poor or uniformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually.").

Lastly, there are no manageability concerns with this case because liability and damages can be determined from the available class wide data, and as discussed above this can be done without concern for an inordinate amount of individualized issues because liability and damages are determined by documents from State Farm that would be common to the Class and statistical measures over the entire population of data available.

## VIII. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification should be granted.

20

Dated: November 30, 2023

Respectfully Submitted,

**THE CONNECTORS REALTY GROUP CORPORATION and DARRYL WILLIAMS**

By: */s/ John D. Scheflow*

Kenneth Anspach, Esq.
Anspach Law Office
111 West Washington Street, Suite 1625
Chicago, Illinois 60602
(312) 407-7888
ken@anspachlawoffice.com

Thomas G. Gardiner
John D. Scheflow
Michelle M. LaGrotta
GARDINER KOCH WEISBERG& WRONA
53 W. Jackson Boulevard, Suite 950
Chicago, Illinois 60604
(312)-362-0000
tgardiner@gkwwlaw.com
jscheflow@gkwwlaw.com
mlagrotta@gkwwlaw.com
For service and copies: ksandman@gkwwlaw.com

## CERTIFICATE OF SERVICE

I, John D. Scheflow, an attorney, hereby certify that on the 30th day of November 2023, I filed the foregoing document through the Court's CM/ECF system, which will serve notice of filing on all counsel of record.

*/s/ John D. Scheflow*
John D. Scheflow