UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE CONNECTORS REALTY GROUP CORPORATION and DARRYL WILLIAMS,<br>　　　　Plaintiffs<br><br>　　v.<br><br>STATE FARM FIRE & CASUALTY COMPANY,<br>　　　　Defendant | No. 19-cv-00743<br><br>Judge Jeremy C. Daniel |

**MEMORANDUM OPINION AND ORDER**

The amended complaint alleges that the defendant violated the Fair Housing Act by investigating and denying insurance claims submitted by policy holders for properties located in zip codes where the majority of residents are Black (Count I); violated 42 U.S.C. §§ 1981 and 1982 by discriminating against policy holders for properties located in zip codes where the majority of residents are Black (Count II); breached its contract with the plaintiffs by failing to pay the plaintiffs' claims (Count III–VIII); breached its duty to defendant and indemnify the plaintiffs as required by the plaintiffs' insurance policy (Count IX); and violated 215 ILCS 5/155 by failing to pay the claims submitted by the plaintiffs (Count XIV).

The amended complaint also seeks to bring an action under §§ 1981 and 1982, as well as under the FHA, on behalf of "All African-Americans in the State of Illinois who reside in majority African-American ZIP Code areas and have submitted claims for property loss and damage to State Farm during the period 2015 until the time

judgment is entered herein and whose claims have either been denied, sent to the State Farm Special Investigations Unit for Fraud or otherwise treated as presumptively fraudulent" (Count XIII). The defendant has moved for summary judgment (R. 315). The plaintiff has moved for class certification (R. 322).

## I. THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A fact is 'material' if it is one identified by the law as affecting the outcome of the case." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 722 (7th Cir. 2015). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). While the Court gives the nonmoving party "the benefit of reasonable inferences from the evidence," it does not construe "speculative inferences in his favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

### B. The FHA Claim

The defendant argues that summary judgment is appropriate on the plaintiffs' FHA claim because the plaintiffs owned the property, an apartment building, as a commercial venture, the plaintiffs did not reside in the property, and because the plaintiffs did not bring suit on behalf of the residents of the property. The FHA makes it unlawful to "[t]o refuse to sell or rent after the making of a bona fide offer, or to

refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). "Section 3604 applies to discriminatory denials of insurance . . . that effectively preclude ownership of housing because of the race of the applicant." *N.A.A.C.P. v. Am. Fam. Mut. Ins. Co.*, 978 F.2d 287, 301 (7th Cir. 1992); *cf. United Farm Bureau Mut. Ins. Co. v. Metro. Hum. Rels. Comm'n*, 24 F.3d 1008, 1015–16 (7th Cir. 1994) ("The race of the person complaining of impermissible [insurance] redlining is irrelevant.").

Under the FHA, "[a]n aggrieved person may commence a civil action in an appropriate United States district court or State court not later than [two] years after the occurrence or the termination of an alleged discriminatory housing practice, or the breach of a conciliation agreement entered into under this subchapter, whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice or breach." 42 U.S.C. § 3613. The FHA's definition of "aggrieved person" includes one who "claims to have been injured by a discriminatory housing practice." 42 U.S.C. § 3602(i). The plain text of the statute does not require a policy holder who does not reside in an apartment building to bring suit on behalf of protected class members who reside in the apartment building. Rather, it only requires one to have suffered an injury caused by a discriminatory housing practice.

While the defendant cites *Shaikh v. City of Chicago*, No. 00 C 4235, 2001 WL 123784, at *4 (N.D. Ill. Feb. 13, 2001), for the proposition that "the FHA does not apply . . . a person who [buys a] property as a commercial venture, has no intention

3

of residing in the property, and is not suing on behalf of protected class members who would reside there," (R. 374 at 27), it overlooks the fact that the plaintiff in *Shaikh* did "not allege that the defendants' conduct was motivated by the protected class status of anyone intending to inhabit the property." *Shaikh*, 2001 WL 123784 at *4. That is not the case here as the plaintiffs allege that the defendant's conduct, that is, its policy of investigating and denying insurance claims submitted by policy holders for properties located in zip codes where the majority of residents are Black, caused the plaintiffs' injuries.[1]

This is consistent with the Supreme Court's and the Seventh Circuit's view of the FHA. In *Thompson v. North American Stainless, LP*, the Supreme Court discussed its cases broadly interpreting the term "aggrieved person" under the FHA and the extent to which those interpretations applied to Title VII cases. 562 U.S. 170, 176–78 (2011). Though the Supreme Court viewed its prior dictum concerning the FHA as "too expansive" given the emergence of the Supreme Court's "'zone of interests' limitation," it also reasoned that too narrow a view would also be inappropriate. *Id.* at 176. Noting that the statute did not limit who could file suit to "the person claiming to have been discriminated against," the Supreme Court

---

[1] A second case cited by the defendant, *Home Quest Mortg. LLC v. Am. Fam. Mut. Ins. Co.*, 340 F. Supp. 2d 1177, 1185 (D. Kan. 2004), reaches a similar conclusion: "The pivotal issue, then, is whether a person who owns residential property that constitutes a 'dwelling' under the FHA, but who owns that property as a commercial venture and does not reside or intend to reside in the dwelling, can assert an FHA discrimination claim with respect to the dwelling. Case law reflects that the answer to this question is: only if the property owner is asserting that the defendant engaged in unlawful discrimination against a person or class of persons who reside or would reside in the dwelling absent the unlawful discrimination."

4

explained that there was no reason to limit "person claiming to be aggrieved" to the person who was the subject of unlawful retaliation. *Id.* at 177.

The same is true here. The text of the statute does not require suit by or on behalf of those discriminated against; rather, it allows suit by anyone injured by a discriminatory housing practice. And as the Seventh Circuit explained, "the notion that [others] are not harmed by discrimination or segregation, and thus could not have been intended beneficiaries of the federal Fair Housing Act" cannot stand. *United Farm Bureau Mut. Ins. Co. v. Metro. Hum. Rels. Comm'n*, 24 F.3d 1008, 1015–16 (7th Cir. 1994) (rejecting notion that FHA did not extend to white person harmed by discrimination or segregation caused by insurance redlining). To the extent the plaintiffs can show that they were harmed by the alleged discriminatory practices of the defendant, they may proceed under the FHA.

For these reasons, the defendant's motion for summary judgment on Count I is denied.

### C. Discrimination Claims

The defendant next argues that no reasonable juror could find that the defendant discriminated against the plaintiffs based on race. In support, the defendant points to its "objective evidence," which consists of (1) claims records and telephone records, and (2) the reassignment of the plaintiffs' initial claim from Tina Beavers to Thomas Wegner. With respect to the former, the plaintiffs alleged in the complaint that Beavers used racially charged language that establishes the defendant's discriminatory intent. This conversation, according to the amended complaint, took place on January 20, 2017. However, the defendant's claims records

5

and telephone records purportedly show that the first time Beavers spoke with Williams was January 23, 2017.

But these records only show that Williams' alleged conversation with Beavers did not occur when Williams said it did. They do not establish what was said during any conversations between Williams and Beavers. During his deposition, Williams provided sworn testimony concerning the racially charged language Beavers allegedly used during a conversation with him. That sworn deposition testimony is sufficient to create a genuine issue of material fact as to whether the defendant's investigation and denial of the plaintiffs' claims were racially motivated. *See REXA, Inc. v. Chester*, 42 F.4th 652, 665 (7th Cir. 2022) (explaining that a non-movant's "testimony . . . based on his personal knowledge," can support "a disputed question of fact").

With respect to the reassignment of the plaintiffs' initial claim, the defendant argues that the reassignment broke the causal chain between Beavers alleged statements and the defendant's treatment of the plaintiffs' claims. The plaintiffs, however, point to other evidence that they believe establish the defendant's discriminatory intent. This evidence includes the declaration of Carla Campbell-Jackson, Ph.D., a former manager in the defendant's fraud investigation department, who claims that the defendant had a policy of investigating and denying claims in predominately Black neighborhoods, and a statistical analysis by Edward Mensah, Ph.D., in which he concludes that "the greater the percentage of African Americans

6

in a particular zip code, the greater the probability the defendant would refer claims for investigation or deny claims."

The defendant objects to Campbell-Jackson's declaration in its entirety because she did not work for the defendant when the plaintiffs filed their claim in 2017. While it is true that Campbell-Jackson stopped working for the defendant in 2016, her testimony concerning the defendant's alleged practices in 2016 are close enough in time to the plaintiffs' claim to support a reasonable inference that the alleged practices were still in place in 2017. *See White*, 829 F.3d at 841. Campbell-Jackson references a "fill the cups" policy that she claims targeted minority communities. According to Roger Krupp, whom the defendant did employ in 2017, a policy by that name was still in effect in 2017. Krupp's testimony describes a policy designed to increase the defendant's utilization of fraud investigators. Whether that policy targeted certain zip codes as the plaintiffs and Campbell-Jackson allege is a question for the jury.

The defendant further objects to Campbell-Jackson's characterization of the "fill the cups" policy as speculative, conclusory, unsupported by specific facts, and lacking foundation. But Campbell-Jackson's declaration relies on her experiences and observations while employed by the defendant, during which she claims to have worked under and implemented the alleged policy. This allows her to testify to her experience with and understanding of the policy. *See REXA, Inc.*, 42 F.4th at 665. Such testimony, particularly when combined with Williams' testimony concerning what Beavers allegedly said to him, is sufficient to create a genuine issue of material

7

fact as to whether the defendant's investigation and denial of the plaintiffs' claims were racially motivated. For instance, one could reasonably infer that what Beavers' allegedly said to Williams and how she treated the plaintiffs' insurance claim stemmed from the implementation of the policy Campbell-Jackson described.

For these reasons, the defendant's motion for summary judgment on Count II is denied.

### D. Class and State-Law Claims

The defendant's motion for summary judgment on the plaintiffs' class and state law claims depend on the success of its motion for summary judgment on the plaintiffs' discrimination claims. Because the Court denied the latter, it also denies the former.

### E. Plaintiff Williams

Plaintiff Williams concedes that he is not a proper plaintiff in this case. (R. 357 at 1, n.1.) Accordingly, the Court enters judgment for the defendant as to all of Plaintiff Williams' claims. Given the entry of judgment against Williams, "plaintiff" refers only to The Connectors Realty Group Corporation from this point forward.

## II. THE PLAINTIFF'S MOTION FOR CLASS CERTIFICATION.

The plaintiff seeks to certify the following class: "All African-Americans in the State of Illinois who reside in majority African-American ZIP Code areas and have submitted claims for property loss and damage to State Farm during the period 2015 until the time judgment is entered herein and whose claims have either been denied, sent to the State Farm Special Investigations Unit for Fraud or otherwise treated as presumptively fraudulent." (R. 325 at 9.) The defendant opposes certification, arguing

8

that: (1) the proposed class is not sufficiently definite such that its members are ascertainable; (2) the plaintiff does not qualify as a member of the proposed class; (3) the plaintiff's representative, Williams, has serious credibility problems that render him an inadequate representative; (4) the plaintiff's claims are not typical because they are subject to unique defenses; (5) the claims are not subject to common proof; (6) individual questions predominate over the common questions; and (7) a class action is not superior to other available methods because the class would be unmanageable and because potential class members have incentives to pursue individual actions.

### A. Legal Standard

"To certify a class under Federal Rule of Civil Procedure 23, a district court must rigorously analyze whether the plaintiff satisfies the rule's requirements." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1025 (7th Cir. 2018) (citation omitted). "Rule 23(a) sets forth four universal requirements for class actions: 'numerosity, typicality, commonality, and adequacy of representation.'" *Id.* (citation omitted). "Where, as here, certification is sought under Rule 23(b)(3), common questions of law or fact must predominate over individual inquiries, and class treatment must be the superior method of resolving the controversy." *Id.* "At this early stage in the litigation, the merits are not on the table." *Id.* The plaintiff must establish each requirement by a preponderance of the evidence. *Id.*

### B. Analysis

#### 1. Numerosity

The defendant does not challenge numerosity. Because the proposed class includes many policy holders, this requirement is readily established.

#### 2. Commonality

The plaintiff holds an insurance policy issued by the defendant. That policy insured a property in a zip code allegedly targeted by the defendant for increased investigation and denial of claims. Whether the defendant actually targeted policy holders in that zip code for investigation and denial of claims is an issue common to the proposed class. *See Ross v. Gossett*, 33 F.4th 433, 437 (7th Cir. 2022) ("[T]o satisfy commonality, the plaintiffs' claim must 'depend on a common contention' and '[t]hat common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'").

To be clear, the FHA claim requires proof that the defendant (1) made unavailable (2) dwellings (3) because of race. *See* 42 U.S.C. § 3604(a). The §§ 1981 and 1982 claims require proof that: (1) the plaintiffs are a member of a racial minority; (2) the defendant had the intent to discriminate on the basis of race; and (3) the discrimination concerned the making or enforcing of a contract. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006), *as amended on denial of reh'g* (May 25, 2006). Whether the defendant had a policy of investigating and denying insurance claims submitted by policy holders for properties located in zip codes where the majority of residents are Black is common to each of these claims.

10

### 3. Typicality

As a policy holder seeking payment on a claim, the plaintiff's interests align with the proposed class—at least with respect to the FHA claim. As explained above, the FHA allows suit by anyone injured by a discriminatory housing practice. All policy holders in the proposed class were allegedly injured by a discriminatory housing practice. In this sense, even if one did not impute Williams' race to the plaintiff—a company solely owned by Williams—a proposed class of "policy holders" would be appropriate even if the plaintiff could not represent a class of "African-Americans." Because "typicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members," *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 725 (7th Cir. 2011), the plaintiff has established typicality.

### 4. Adequacy

"A named plaintiff must be a member of the putative class and have the same interest and injury as other members. A representative might be inadequate if he is subject to a substantial defense unique to him." *Beaton*, 907 F.3d at 1018 (citation omitted). "The presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation." *CE Design Ltd.*, 637 F.3d at 726. "A named plaintiff who has serious credibility problems or who is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative." *Id.*

11

That is the case here. Williams—who is the sole owner of the plaintiff and its representative—claims that he spoke to Beavers on January 20, 2017, and offers a notation in his planner as proof of that. The defendant notes that Williams originally claimed that he spoke to Beavers days earlier, suggesting that Williams fabricated the notation in his planner, and points to telephone records that show that, though Williams called the defendant on January 20, 2017, Williams did not connect to a telephonic device associated with Beavers that day. Williams also claims that he sent the defendant a copy of the plaintiff's lease agreement with Lynette Crawley in February 2017. The defendant claims that its records show that Williams first sent the defendant the Crawley lease in May 2017 and, more importantly, that Crawley testified that she did not sign the purported lease, did not know how her signature ended up on the purported lease, and that she had never been a tenant at the property identified in the lease. This evidence raises serious credibility issues that the plaintiff must contend with.

The plaintiff also has to contend with the fraud defense that stems from Williams' representations concerning the plaintiff's insurance claims, as well as from any alleged misrepresentations made in connection with the plaintiff's application for insurance. Given the testimony of Crawley, who appears to be a neutral third party, this defense is, at a minimum, arguable. What is clear is that issues related to Williams' credibility and the defendant's fraud defense against the plaintiff will require significant attention at trial; attention that will be to the detriment of the class. *See, e.g., CE Design Ltd.*, 637 F.3d at 728 ("For an assault on the class

12

representative's credibility to succeed, the party mounting the assault must demonstrate that there exists admissible evidence so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of the absent class members' claims."). This renders the plaintiff inadequate as a class representative.

### 5. Predominance

"While similar to Rule 23(a)'s requirements for typicality and commonality, 'the predominance criterion is far more demanding.'" *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814 (7th Cir. 2012) (citation omitted). "The predominance inquiry 'calls upon courts to give careful scrutiny to the relation between common and individual questions in a case.'" *Eddlemon v. Bradley Univ.*, 65 F.4th 335, 339 (7th Cir. 2023). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member; a common question is one where the same evidence will suffice for each member to make a *prima facie* showing or the issue is susceptible to generalized, class-wide proof. *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 843–44 (7th Cir. 2022).

In this case, key issues to be resolved are whether the defendant investigated and denied claims based on race. This is not a case where all claims submitted by policy holders for properties located in zip codes where the majority of residents are Black were flagged for investigation and denied. As such, one must determine (1) whether the defendant referred each claim for a legitimate reason or because of the location of the property and (2) whether the defendant denied each claim for a

13

legitimate reason or because of the location of the property. These determinations present individualized questions that preclude generalized, class-wide proof. Put differently, the reason for each referral and each denial will have to be adjudicated, necessitating a number of miniature trials within a trial. Accordingly, the Court finds that these individual issues predominate.

To the extent that the plaintiff claims that the predominate issue is whether the defendant's alleged policy had a disparate impact, the Court agrees with the defendant that the plaintiff's disparate impact claims were dismissed for failure to state a claim. The defendant correctly notes that the Court held that the plaintiffs had failed to state a disparate impact claim. (R. 346 at 27; *citing* R. 38 at 15-16.) The plaintiff does not address this argument. (*See* R. 391 at 20 (stating only that "State Farm ignores that Plaintiffs still have a disparate impact claim").) In its prior opinion, the Court explained that the plaintiffs' reliance on an industry-wide—as opposed to a defendant specific—data set meant that the plaintiffs failed to state a claim. The Court referenced paragraphs 29 and 40 of the amended complaint, both of which appear in Count I. While the Court's order addressed Count XI, that was an error as the reasoning equally applies to Count I. This should come as no surprise to the plaintiff as the defendant's motion argued that "[plaintiffs] also fail to allege a disparate impact claim under the FHA." (R. 28 at 15-17.) But even if the plaintiff's disparate impact theory remained, that would only go to the referral and not the denial. Because the greatest harm stems from the denial of claims, whether the defendant denied claims based on race still would predominate all other issues.

14

### 6. Superiority

"Rule 23(b)(3)'s superiority requirement . . . is comparative: the court must assess efficiency with an eye toward 'other available methods.'" *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 664 (7th Cir. 2015). Courts must consider: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3).

Here, the plaintiff has failed to meet its burden. It is unclear whether putative class members have an interest in individually controlling their claims because the value of the claims are not so small as to render individual cases unlikely. There is no evidence concerning other litigation involving putative class members, and, while it makes sense to concentrate the litigation of the claims in this forum, the putative class is limited to Illinois and the data presented by the plaintiff limited to Cook County. As such, any cases filed by individual plaintiffs would likely be filed in this forum. The individualized determinations required by the referral and denial of claims introduce some difficulties in managing the class action. The same is true for the individualized damages determinations. Together, these individualized determinations establish that a class action is not superior to other available methods.

Because the plaintiff has not established adequacy, predominance, or superiority, the Court denies the plaintiff's motion for class certification.

15

## CONCLUSION

For the reasons stated in this memorandum opinion and order, the defendant's motion for summary judgment (R. 315) is granted in part and denied in part. The Court grants the defendant's motion with respect to Williams and denies the motion in all other respects. The plaintiff's motion for class certification (R. 322) is denied. The Court will hear argument on the defendant's motion to bar the testimony of the plaintiff's expert (R. 340) on September 4, 2024, at 9:30 a.m. The parties should be prepared to address whether Dr. Mensah's report reliably reflects the percentage of claims paid (as opposed to the percentage of claims denied) by zip code and whether the percentage of claims paid by zip code would be helpful to the trier of fact.

Date: August 21, 2024

JEREMY C. DANIEL
United States District Judge